**NOT FOR PUBLICATION**

# UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: ) | BAP No.   CC-15-1005-TaKuD |
| ) | |
| PETER PEDROM ETESAMNIA, ) | Bk. No.   2:12-bk-43661-TD |
| ) | |
| Debtor. ) | Adv. No.   2:13-ap-01695-TD |
| _____ ) | |
| ) | |
| KOUROSH MALEKAN, ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | **MEMORANDUM**[*] |
| ) | |
| PETER PEDROM ETESAMNIA, ) | |
| ) | |
| Appellee. ) | |
| _____ ) | |

Argued and Submitted on September 24, 2015
at Malibu, California

Filed – November 3, 2015

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Thomas B. Donovan, Bankruptcy Judge, Presiding

_____

Appearances:     A. David Youssefyeh of Ady Law Group, P.C. argued for appellant; Edmond Nassirzadeh of Nass Law Firm argued for appellee.

_____

Before:   TAYLOR, KURTZ, and DUNN, Bankruptcy Judges.

---

[*]   This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8024-1(c)(2).

**INTRODUCTION**

Appellant Kourosh Malekan commenced an adversary proceeding against debtor Peter Pedrom Etesamnia and sought to except claims from discharge under § 523(a).[1] The bankruptcy court later dismissed a second amended adversary complaint with prejudice pursuant to Civil Rule 12(b)(6).

We AFFIRM the dismissal of the § 523(a)(2)(B) and (a)(6) claims. But, we AFFIRM in part and REVERSE in part on dismissal of the § 523(a)(2)(A) and (a)(3)(B) claims.

**FACTS[2]**

There is no dispute that prepetition Malekan invested money in three business ventures that the Debtor either managed or introduced to him. After the ventures failed, Malekan commenced an action on October 16, 2012 against the Debtor and in California state court. Apparently the original complaint was not served on the Debtor, but he was served with the first amended complaint in June, 2013.

In the meantime, on October 4, 2012, the Debtor filed a chapter 7 petition. He did not list Malekan as a creditor because, as he later explained, he did not believe he owed him

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532. All "Rule" references are to the Federal Rules of Bankruptcy Procedure. All "Civil Rule" references are to the Federal Rules of Civil Procedure.

[2] We exercise our discretion to take judicial notice of documents electronically filed in the adversary proceeding and in the underlying bankruptcy case. See Atwood v. Chase Manhattan Mortg. Co. (In re Atwood), 293 B.R. 227, 233 n.9 (9th Cir. BAP 2003). We do so for context only.

any money.  In January 2013, the Debtor received his bankruptcy discharge.

Malekan alleged that he was unaware of the bankruptcy filing.  He subsequently commenced an adversary proceeding against the Debtor.  The adversary complaint, as initially filed and twice amended, was predicated on allegations of fraud in relation to the investments and alleged claims for relief under § 523(a)(2)(A), (a)(2)(B), (a)(3)(B), and (a)(6).

**A.    Factual allegations pleaded in the Second Amended Complaint ("SAC")**

In the fall of 2007, an individual named Jalinous Nehouray introduced Malekan to the Debtor; Malekan and Nehouray "were good friends for many years."  Malekan soon made a series of investments.

**1.    Malekan alleged as follows in connection with the coins venture.**

The Debtor and Nehouray formed two business entities – Pars Mint, Inc. and Empire Global Mint, Inc. (jointly, the "Coins Entities") – for the purposes of manufacturing and selling commemorative gold coins of cultural significance, both ethnic and popular.  Specifically, Pars would produce and sell coins of Amir Kabir, a historical Iranian political figure, while Empire would focus on various coins bearing licensed images from Fox Studios and Playboy.  The Debtor encouraged Malekan's investment in the Coins Entities representing, among other things, that the Debtor would also invest in the Coins Entities and that Malekan's investment would be used solely for the purpose of creating, manufacturing, and marketing the coins.

3

Within a month after meeting with the Debtor and Nehouray, Malekan invested approximately $160,000 in the Coins Entities. In return for his investment, Malekan anticipated receipt of either a 50% equity share or a return of his investment, plus interest.

The Debtor's representations regarding the Coins Entities were false at the time made, he was aware of the falsity, and Malekan reasonably relied on the false representations. In fact, the initial $160,000 investment was used by the Debtor for other gold coin companies, ventures in loan modifications and film/entertainment, and to purchase luxury items for resale (e.g., Rolex watches, antiques, coins, and rugs).

After the initial investment, Malekan continued to meet with the Debtor and Nehouray regarding the possibility of additional investments. Over the next two years, Malekan made four additional investments totaling $267,500 in the Coins Entities. Malekan was damaged as a result of the Debtor's fraud.

**2. Malekan alleged as follows in connection with the nutritional supplement venture.**

In September 2008, the Debtor represented to Malekan that he had connections allowing him to get licensing from BTI, a nutritional supplement company, for overseas distribution rights. Malekan understood that in exchange for his $21,500 investment, he would receive 50% of the profits, or the return of his investment, plus interest; he also understood that the Debtor would invest in the venture. Malekan thereafter sent a check to BTI for $21,500. The Debtor subsequently contacted BTI

4

and procured Malekan's investment for himself. The Debtor's representations regarding BTI were false, the Debtor was aware of the falsity, Malekan reasonably relied on the false representations, and Malekan was damaged when the Debtor obtained the BTI investment from BTI.

### 3. Malekan alleged as follows in connection with film venture.

The Debtor and Nehouray also approached Malekan about a film investment opportunity with D Street Films. The Debtor represented to Malekan that he had invested in the film and urged Malekan to invest as well. Malekan then met with Demetrius Navarro, President of D Street Films, who confirmed the investments of the Debtor and Nehouray. In return for his investment, Malekan would receive credit as a "co executive producer" on the film and a 13.33% share of the film's gross receipts. As a result, Malekan invested $25,000 in the film venture. The Debtor's representations were false when made, the Debtor was aware of the falsity, Malekan reasonably relied on the false representations, and Malekan was damaged as a result.

## B. Procedural history of the adversary proceeding

### 1. Initial adversary complaint

The Debtor moved to dismiss the initial complaint and subsequently filed an answer. The Debtor admitted to very little: the bankruptcy court's jurisdiction, appropriate venue, and his chapter 7 bankruptcy filing. He also admitted that he did not schedule Malekan as a creditor. Otherwise, he denied each allegation in the 65-paragraph complaint based on a lack of sufficient knowledge or information.

At a continued status hearing, the bankruptcy court expressed its concerns regarding the initial complaint. Among other things, it stated that the complaint did not plead the fraud claims with particularity. It cautioned that if Malekan was "serious about this lawsuit, [he] need[ed] to do more." Hr'g Tr. (Mar. 6, 2014) at 6:25; 7:1. The bankruptcy court set a deadline to file an amended complaint and continued the status conference.

### 2. First amended complaint

Malekan filed a first amended complaint and the Debtor moved to dismiss it. At a continued hearing, the bankruptcy court determined that the Debtor's second motion to dismiss was not timely filed and denied the motion on that basis. The bankruptcy court noted, however, that it had an independent duty to examine the amended "complaint and determine whether it adequately set[] forth a basis to go forward on the prayer that seeks denial of discharge, under [§] 523(a)(2)(A) especially." Hr'g Tr. (July 24, 2014) at 1:20-22. Having done that, it found the complaint "ambiguous, confusing, and substantively inadequate in some particulars." Id. at 1:24-25.

The bankruptcy court then detailed issues and allegations that it found problematic. It concluded that dismissal with leave to amend was warranted, but again cautioned Malekan: "this will be your third try, and if you can't come up with something more concrete that will pass the test we've been talking about now for several months, I may have to dismiss this at the next hearing with prejudice." Id. at 11:24-25; 12:1-3.

///

6

### 3. The SAC

After the filing of the SAC, the Debtor once again moved to dismiss the complaint. Prior to the hearing, the Debtor filed a request for judicial notice; in particular, he sought judicial notice of a joint motion for approval of proposed settlement between Nehouray, the Coins Entities, and Malekan in the state court action.

At the hearing, the bankruptcy court dismissed the SAC with prejudice based on its "assessment, after careful reading of the papers, that [it was] pretty much a rehash of the initial complaint" and first amended complaint. Hr'g Tr. (Nov. 12, 2014) at 1:16-19. It found that the SAC was "meandering and confusing," lacked specificity as to the financial documents, and merely offered "labels and conclusions, a formulaic recitation of elements of a cause of action." Id. at 1:20-21; 3:21-22.

Next, the bankruptcy court entered an order dismissing the SAC with prejudice. In the order, it determined that the SAC "struggle[d] but fail[ed] to meet the requirements" of Civil Rule 8(a)(2) and 9(b). It found that the allegations "contain[ed] only vague, conclusory statements asserting [the Debtor's] fraudulent intent along with conclusory references to . . . opinions rather than actionable fact about the enterprises in question." These allegations "assert[ed] the possibility of fraudulent intent or conduct on the part of [the Debtor] but [were] far too general to satisfy the concept of plausibility." Thus, the SAC "fail[ed] to raise any allegation of fact to the level of plausibility but leaves the SAC in the realm of

conjecture about wrongdoing by [the Debtor]." Instead, "[t]he SAC raise[d] nothing more than the bare possibility of fraud."

Malekan timely appealed.

**JURISDICTION**

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(I). We have jurisdiction under 28 U.S.C. § 158.

**ISSUE**

Whether the bankruptcy court erred in dismissing the SAC.[3]

**STANDARD OF REVIEW**

We review dismissal of an adversary proceeding under Civil Rule 12(b)(6) de novo. See Johnson v. Fed. Home Loan Mortg. Corp., 793 F.3d 1005, 1007 (9th Cir. 2015).

**DISCUSSION**

**A. Motion to Strike**

Pursuant to Rule 8009, Malekan moves to strike a motion jointly filed in the state court action by Malekan, Nehouray, and the Coins Entities, seeking court approval of a settlement agreement among those parties ("State Court Settlement Motion") from the Debtor's supplemental excerpt of record. The Debtor was not a party to the proposed settlement. Malekan argues that he did not include the item in his designation of record on

---

[3] Although Malekan poses the issue on appeal as whether the bankruptcy court erred in dismissing the SAC without leave to amend, he fails to advance any argument on the issue of dismissal with prejudice. As a result, we do not address that aspect of the bankruptcy court's decision. See Padgett v. Wright, 587 F.3d 983, 985 n.2 (9th Cir. 2009) (per curiam) (arguments "not specifically and distinctly raised and argued in appellant's opening brief" are deemed waived).

8

appeal, nor did the Debtor file a supplemental designation of record so as to appropriately include the item.  No response was provided by the Debtor.

Prior to the hearing on his third motion to dismiss, the Debtor requested that the bankruptcy court take judicial notice of the State Court Settlement Motion; the bankruptcy court, however, did not rule on the request.  The State Court Settlement Motion only indirectly involves the Debtor and the adversary proceeding.  We deny the motion to strike but look to the State Court Settlement Motion solely for the purpose of noting that it was filed in the state court action and not for the truth of the factual assertions contained therein or the declaratory evidence attached thereto.

**B.    Whether the bankruptcy court erred in dismissing the SAC**

A motion to dismiss under Civil Rule 12(b)(6) (incorporated into adversary proceedings by Rule 7012(b)) challenges the sufficiency of the allegations set forth in a complaint and "may be based on either a lack of [: (1)] a cognizable legal theory or  . . . [(2)] sufficient facts alleged under a cognizable legal theory."  Johnson v. Riverside Healthcare Sys., LP, 534 F.3d 1116, 1121 (9th Cir. 2008) (internal quotation marks and citation omitted).  The court's review is limited to the allegations of material facts set forth in the complaint, which must be read in the light most favorable to the non-moving party, and together with all reasonable inferences therefrom, must be taken as true.  Pareto v. Fed. Dep't Ins. Corp., 139 F.3d 696, 699 (9th Cir. 1998).

Consistent with Civil Rule 8(a)(2), the factual allegations

9

in the complaint must state a claim for relief that is facially plausible. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); see also Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). Thus, based on the Iqbal/Twombly rubric, the bankruptcy court must first identify bare assertions that "do nothing more than state a legal conclusion—even if that conclusion is cast in the form of a factual allegation," and discount them from an assumption of truth. See Moss v. U.S. Secret Serv., 572 F.3d 962, 969 (9th Cir. 2009). Then, if there remain well-pleaded factual allegations, the bankruptcy court should assume their truth and determine whether the allegations "and reasonable inferences from that content" give rise to a plausible claim for relief. Id. "[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." 556 U.S. at 679.

Fraud claims are subject to a heightened pleading standard. See Fed. R. Civ. P. 9(b) (incorporated into adversary proceedings by Rule 7009). Civil Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Thus, a complaint alleging fraud must satisfy both Civil Rules 8 and 9. Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1055 (9th Cir. 2011). Ultimately, "the court reviews all allegations holistically, rather than in isolation, to determine if a complaint is well-pleaded." Petrie v. Elec. Game Card, Inc., 761 F.3d 959, 970 (9th Cir. 2014).

///

///

10

**1.   The bankruptcy court did nor err in dismissing the § 523(a)(2)(B) claim.**

Section 523(a)(2)(B) excepts from discharge a debt "for money, property, services, or an extension, renewal, or refinancing of credit," obtained by the use of a materially false written financial statement.  The statement must set forth the financial condition of the debtor (or an insider), the creditor must reasonably rely on it, and the debtor must create the statement or cause it to be published with an intent to deceive.

The SAC discussed written financial statement(s) only in connection with the coins.  In particular, it alleged that:

• Between October and November 2007, the Debtor showed Malekan "various financial documents for [the Coins Entities] purporting to show not only the expected expenses of producing the three types of gold coins . . . but . . . the expected sales and profits from selling these coins."

• Between November 2007 and July 2008, the Debtor showed Malekan "various alleged financial statements/documents for the [Coins Entities]" showing "that the costs of development and production of the coins were higher than what he and Nehouray expected due to unforeseen manufacturing costs, but that their licensing and marketing plans were progressing well and that there was high demand for the coins."

• By the end of July 2008, the Debtor emailed and showed Malekan "various financial statements purporting to show the use of [Malekan's] funds for the manufacture[] of gold

11

coins."

- On or about July 20, 2008, the Debtor showed Malekan "various financial statements for the [Coins Entities]" showing "that both [Coins Entities] were coming along well but that production costs were continuing to rise so more money was needed to finish production of the gold coins."
- Through June 2010, Debtor continued to show Malekan "financial statements and marketing materials for the two [Coins Entities], on the work him and Nehouray were allegedly doing on the projects and continued to represent to Plaintiff that he was moving forward on the plan to manufacture the coins."

The term "various financial statements," however, is vague and ambiguous. Viewing the SAC in the light most favorable to Malekan, the factual content as pleaded was insufficient and precluded the drawing of a reasonable inference that the Debtor was liable for the alleged fraud by means of materially false written financial statements respecting the Coins Entities' financial condition. Malekan had three opportunities to allege a plausible claim; he failed to do so. It remains unclear what documents the SAC referred to. Therefore, the bankruptcy court properly dismissed the § 523(a)(2)(B) claim.

**2. The bankruptcy court did nor err in dismissing the § 523(a)(6) claim.**

Section 523(a)(6) excepts from discharge a debt arising from a debtor's "willful and malicious" injury to another person or to the property of another. Barboza v. New Form, Inc. (In re Barboza), 545 F.3d 702, 706 (9th Cir. 2008). A predicate

12

of § 523(a)(6) is a tort claim under state law. See Lockerby v. Sierra, 535 F.3d 1038, 1041 (9th Cir. 2008).

At the outset, we note that this claim was technically late; it survived only to the extent that the § 523(a)(3) claim supports it. In the SAC, however, the § 523(a)(3) claim does not reference § 523(a)(6).

Further, Malekan failed to allege a plausible § 523(a)(6) claim. In the prior complaints, Malekan referred to an alleged § 523(a)(6) claim solely in the caption and, implicitly, in the prayer for relief, which broadly referred to four claims for relief. The SAC did not improve on this cursory treatment; it incorporated paragraphs 1-59 of the factual allegations and asserted that the Debtor "willfully and maliciously damaged [Malekan's] claims against [the Debtor] arise out of . . . § 523(a)(6)." This was insufficient.

The SAC did not identify the alleged tort Malekan believed actionable. To the extent that the tort was fraud, it was merely duplicative of the § 523(a)(2)(A) claim. The SAC, thus, failed to allege particular well-pleaded facts that supported a plausible § 523(a)(6) claim for relief. The bankruptcy court did not err when it dismissed this claim.

**3.    With one exception, the bankruptcy court erred in dismissing the § 523(a)(2)(A) claim.**

Section 523(a)(2)(A) excepts from discharge a debt "for money, property, services, or an extension, renewal, or refinancing of credit" obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's . . . financial condition." To prevail

13

on such a claim, a creditor must prove, by a preponderance of the evidence: (1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) the debtor's knowledge of the falsity or deceptiveness of his representation or omission; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's representation or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct. Ghomeshi v. Sabban (In re Sabban), 600 F.3d 1219, 1222 (9th Cir. 2010).

### a. Coins venture

Malekan argues that the SAC "list[ed] eight different knowingly false representations made by [the] Debtor . . . which [he] relied upon and initially led [him] to give Debtor the money he was requesting." Op. Br. at 12-13. He further argues that the SAC also "list[ed] in detail ten additional materially and knowingly false representations by Debtor to induce [Malekan] to continue giving him additional funds." Id. at 13.

The SAC generally alleged that the Debtor knew that his representations to Malekan were false at the time made and that the Debtor never intended to use the investments for the coins venture; that Malekan relied on the Debtor's representations in making the investments; and that Malekan was damaged, as he never received a 50% equity interest or the return of his investment.

Some of the alleged misrepresentations – e.g., that the Debtor and Nehouray had the "know-how," relationships, and connections to get the "best pricing" for the coins venture, that there was an extensive demand for the coins, and that the

14

Coins Entities were "coming along well" - were subjective expressions of opinion, rather than factual statements capable of objective verification. "Puffing" is not tantamount to a misrepresentation. See Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc., 774 F.3d 598, 606 (9th Cir. 2014) ("'Puffing' concerns expressions of opinion, as opposed to knowingly false statements of fact . . . .") (citation omitted).

But, after applying the standards required to the remaining allegations, we conclude that the SAC alleged sufficient facts in relation to the investments in the coins venture, so as to state a § 523(a)(2)(A) claim that was plausible on its face. In particular, the SAC alleged that the Debtor solicited Malekan's investments based on the following allegedly false representations:

- The Debtor would invest his own funds in the Coins Entities;
- Malekan's investment would be used solely for the purpose of creating, manufacturing, and marketing the coins;
- The cost of creating and producing the molds for the three coins was $80,000 per coin;
- The Fox licensing fees were $50,000;
- Production of the coins was imminent and Malekan would soon be able to see dies, sculpts, or molds of the coins;
- In return for his investment, Malekan would receive a 50% equity share or the return of his investment, plus interest; and
- Later, that production costs continued to rise and additional capital was needed to finish production of the

15

coins.

The SAC alleged that these representations were false, which the Debtor knew at the time he made them, based on the following:

- The Debtor did not invest his own funds in the Coins Entities;
- Malekan's investment was not solely used for the coins venture but, instead, was "used for personal expenses and other business ventures of [the Debtor], unrelated to [Malekan]," e.g., "other 'gold' coin companies (unrelated to [the Coins Entities], real estate ventures, loan modification ventures, and film/entertainment ventures (including but not limited to D Street Films), and to purchase Rolex watches, and other antiques, coins and rugs which were sold to third parties by [the Debtor] the proceeds of which were kept by him."
- The Debtor never intended to pay the coins vendors, whom, in fact, he failed to pay;
- Malekan never saw the dies, sculpts, or molds for any of the coins;
- The cost of each coin mold was $20,000, not $80,000; and
- The Fox licensing fees were $25,000, not $50,000.

Moreover, the SAC alleged that neither the Debtor nor Nehouray informed Malekan that they had received $135,000 from a licensing rights dispute with Fox but split those funds between themselves. And, finally Malekan alleged that even if some of his investments were used for the coins production, the "process was far behind schedule and [the Debtor] had no reasonable basis

for asserting to [Malekan] that the production schedule was going ahead as planned."

As to the $150,000 investment, the SAC further alleged that Malekan was the primary caretaker of his cancer-stricken father, which the Debtor and Nehouray were aware of; consequently, Malekan alleged that he was prevented from verifying the status of the coins venture. Then, as to the final investment of $12,500, the SAC alleged that after Malekan inquired about the status of the venture and in an effort to keep "stringing him along," the Debtor showed Malekan a "sample" of the Amir Kabir coin and "plans for other coins that were 'about to be produced.'" Based on his belief that "everything was on target," Malekan provided a final investment of $12,500 in November 2009.

These allegations were not conclusory and, thus, were entitled to an assumption of truth. Accepted as true and construed in the light most favorable to Malekan, the allegations were adequate to assert a plausible fraud claim as to the coins venture investment. Consequently, the bankruptcy court erred in dismissing the § 523(a)(2)(A) claim as to the coins venture, and we REVERSE that aspect of the dismissal order.

### b. Film venture

In his brief on appeal, Malekan does not address the § 523(a)(2)(A) issue in relation to the film venture with specificity; his focus is on the coins venture. Nonetheless, on de novo review, we conclude that the bankruptcy court erred in dismissing the § 523(a)(2)(A) claim with respect to this

17

investment.

The SAC alleged that, in October 2008, in order to procure additional money from Malekan, the Debtor misrepresented that he had also invested in the film venture and, later, that the film was being made. It also alleged the following misrepresentations:

• Navarro, as president of D Street Films, told Malekan that the Debtor had already invested in D Street Films;

• The Debtor, Nehouray, and Navarro all told Malekan that the film was about to be made and distributed; and

• In exchange for his investment, Malekan would get credit as "co-executive producer" on the film and would receive 13.33% of the film's gross receipts.

The SAC alleged that these representations were not true, which the Debtor knew at the time, based on the following:

• The Debtor never invested his own money in the venture;

• But, to the extent the Debtor invested any money, the funds were derived from Malekan's investments in the coins venture;

• Navarro and D Street Films were "fronts" for the Debtor and Nehouray;

• The Debtor, Nehouray, and Navarro "split up" Malekan's investment amongst themselves; and

• No film was ever made.

These allegations were not conclusory and, thus, were entitled to an assumption of truth. Accepted as true and construed in the light most favorable to Malekan, the allegations were adequate to assert a plausible fraud claim as

18

to the film investment. As a result, the bankruptcy court erred in dismissing the § 523(a)(2)(A) claim as to the film venture, and we REVERSE that aspect of the dismissal order.

### c. Nutritional supplement venture

The nutritional supplement venture is a different matter. Again, Malekan does not address the nutritional supplement venture specifically in his brief on appeal. We conclude that there was no error with respect to dismissal of the fraud claim related to this investment.

The SAC alleged that, in September 2008, the Debtor knowingly made the following false representations to Malekan:

- The Debtor had connections to get the BTI licensing rights for overseas distribution rights;
- Malekan would receive 50% profit return or a return of the investment, plus interest; and
- The Debtor would match Malekan's investment.

It further alleged that once the Debtor was made aware that Malekan had made his investment, the Debtor contacted BTI and "arranged for a refund of [Malekan's] investment back to him personally, pocketing the money for his personal uses."

Other than offering conclusory statements, the SAC did not plead with the requisite particularity that BTI served as a cover for the Debtor's fraudulent activities. There was no allegation in regards to BTI's legal structure, where and when Malekan sent the $21,500 investment check, or whether BTI was the alter ego of the Debtor. Nor was there an allegation that Malekan made the investment in the Debtor's name.

Even accepting the factual allegations as true, we are not

19

required to accept as reasonable the inference that the Debtor had the ability to contact BTI directly and procure Malekan's investment. That inference is not reasonable based on the factual allegations pleaded in the SAC. While it is possible that the Debtor had the means and ability to do so, the factual allegations were inadequate to assert a plausible fraud claim in regards to the nutritional supplement investment.

Based on the foregoing, the bankruptcy court did not err in dismissing the § 523(a)(2)(A) claim as to the nutritional supplement venture.

**4. The bankruptcy court erred in dismissing the § 523(a)(3)(B) claim solely to the extent that the claim rests on § 523(a)(2)(A).**

Section 523(a)(3)(B) excepts a debt from discharge where the debtor fails to schedule the creditor and the debt, and the debt is "of a kind specified in paragraph (2), (4), or (6)" of § 523(a). The creditor, however, must not possess notice or actual knowledge of the bankruptcy case. See Perle v. Fiero (In re Perle), 725 F.3d 1023, 1026 (9th Cir. 2013).

The SAC incorporated paragraphs 1-59 in relation to the § 523(a)(3)(B) claim and alleged that the Debtor failed to schedule him as a creditor, "despite the fact that [Malekan] ha[d] been hounding [the Debtor] for years asking for his money back and accusing [the Debtor] of committing fraud." It further alleges that the Debtor did not have notice of the bankruptcy in time to file a timely objection to discharge.

A claim under § 523(a)(3)(B) is predicated on a § 523(a)(2), (a)(4), or (a)(6) claim; a function solely of

20

timing, it does not exist independently of the three enumerated subsections providing for an exception to discharge. <u>See</u> <u>Urbatek Sys., Inc. v. Lochrie (In re Lochrie)</u>, 78 B.R. 257, 259-60 (9th Cir. BAP 1987). Here, as previously stated, the § 523(a)(3)(B) claim was not pleaded in relation to the § 523(a)(6) claim; thus, § 523(a)(6) cannot serve as a basis for a viable § 523(a)(3)(B) claim. Dismissal of the § 523(a)(3)(B) claim also remains appropriate, to the extent it derived from the § 523(a)(2)(B) claim or the nutritional supplement investment contained within the § 523(a)(2)(A) claim.

But, as stated, the SAC contained sufficient allegations to support a plausible § 523(a)(2)(A) claim as to the investments in the coins venture and the film venture. As a result, the SAC contained sufficient allegations to state a plausible § 523(a)(3)(B) claim based on § 523(a)(2)(A). Thus, dismissal of the § 523(a)(3)(B) claim in that respect was erroneous, and we REVERSE that aspect of the dismissal order.

**CONCLUSION**

Based on the foregoing, We AFFIRM the bankruptcy court on its dismissal of the § 523(a)(2)(B) and (a)(6) claims. But, we AFFIRM in part and REVERSE in part on its dismissal of the § 523(a)(2)(A) and (a)(3)(B) claims.

21